ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JUN 14 2005
U.S. COURT OF FEDERAL CLAIMS

**PURE POWER, INC.**

**vs.**

~~Miller~~

**THE UNITED STATES**

**No. 05-559C**

**Assigned to Judge Christine O. C. Miller**

**THIRD AMENDED COMPLAINT FOR:**
**1. VIOLATION OF PROCUREMENT MANUAL POLICY AND PROCEDURES; 2. BREACH OF CONTRACT**

Michael J. Buley, Esq., Bar No. 164249
Law Offices of Michael J. Buley
20271 S. W. Birch Street, Suite 100
Newport Beach, California 92660
Telephone: (949) 752-1161
Facsimile: (949) 251-0337

Attorney for PURE POWER, INC.

## JURISDICTION AND VENUE

1. The Court has jurisdiction of this cause pursuant to 28 U.S.C. § 1339 and 39 U.S.C. §§ 401 and 409(a);

2. This action involves a federal question as plaintiff alleges defendant, United States Postal Service, has violated its own policies and procedures as codified in the Code of Federal Registers § 601.00 (5 U.S.C. § 551 et seq., 39 U.S.C. § 410(a), 31 U.S.C. §§ 3551-3556);

3. Venue lies in this Central District of California pursuant to 28 U.S.C. § 1391(e) because a defendant is an officer or employee of the United States Postal Service or its agencies;

(a) One of the plaintiffs resides in this district; and

(b) No real property is involved in this action.

## THE PARTIES

4. Plaintiff, PURE POWER! Inc., (hereinafter "PURE POWER"), is a corporation organized and existing under the laws of the State of California. PURE POWER is qualified and licensed to do business in California with its principal place of business at 15751 Chemical Lane, Huntington Beach, California 92649.

5. Defendant, United States Postal Service (hereinafter "U.S.P.S."), is a federal agency organized and existing pursuant to Federal Law and is responsible for conducting day to day business such as negotiating private contracts with suppliers and vendors like PURE POWER.

6. Defendant, William J. Henderson, at all relevant times was the Postmaster General and Chief Executive Officer of the U.S.P.S. with authority to make purchasing decisions for the U.S.P.S. and is sued individually and as a representative of the U.S.P.S.

7. Defendants, Does 1 through 10, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to plaintiff. When their true names and capacities are ascertained, plaintiff will amend this Complaint by inserting their true names and capacities herein. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants are responsible in some manner for the occurrences herein alleged and that plaintiff's damages as herein alleged were proximately caused by such defendants.

## FACTS GIVING RISE TO ACTION

8. U.S.P.S. has promulgated its own set of practices and procedures for conducting business with private vendors, suppliers and contractors. These practices and procedures can be found in the U.S.P.S. Procurement Manual (hereinafter "Manual"). (Relevant portions of the Procurement Manual are attached hereto as Exhibit "A" and incorporated herein by this reference.)

9. The U.S.P.S. Manual has been incorporated by reference into the Code of Federal Regulations at 39 C.F.R. § 601.100.

10. Chapter 1 of the Manual at paragraph 1.7.2.a. reads:

> Purchases must be made on the basis of adequate competition whenever feasible. Adequate competition means the solicitation and participation of a sufficient number of capable sources to ensure that the required quality and quantity of goods and services is obtained when needed, and that the price is fair and reasonable.

11. Chapter 4 of the Manual at paragraphs 4.4.1.b and 4.4.1.c read:

> *Limitations on Use*. Noncompetitive purchasing methods may be used only when competitive purchasing is not feasible or appropriate.
>
> *Applicability*. This section applies to all purchases except:
>
> 1. Orders placed against mandatory national and area contracts (see 3.1.4).
>
> 2. Purchases from a single approved source (where only one source is approved; see 3.1.6.b).
>
> 3. Orders placed under indefinite-delivery contracts (see 5.1.5).
>
> 4. Purchases not exceeding the competitive threshold (see 4.3.1.d).
>
> 5. Orders placed against GAS's Federal Supply Schedules and from other non-GSA government sources, including Federal Prison Industries (see 3.1.5). Group 70 and Group 58 IRMS FIPS schedule contracts (see 3.1.5.b.3) do not fall within this exception.
>
> 6. Purchases of supplies and services from qualified workshops (as determined by the Committee for Purchase from People who are Blind or Severely Disabled) who are employing people who are blind or severely disabled (see 3.1.3).

7. Contracts with any federal, state, or local government agencies.

8. Contracts with firms that provide supplies or services (such as utilities and passenger or general freight transportation services, but not including the transportation of mail) subject to uniform tariff, government regulation or areawide rates.

9. Institutional memberships authorized by Employee and Labor Relations Manual (ELM) 750, exhibition fees, booth space, and attendance at outside conferences.

10. Subscriptions and renewals of subscriptions to periodicals and serial publications (includes electronic information service subscriptions).

11. Advertisements.

12. Certain repurchases against a defaulted contractor's account (see 6.10.1.b.3).

13. Modifications within the scope of a contract or the exercise of contractual options, such as lease extensions and renewal options.

14. Modifications, enhancements, upgrades, maintenance, and renewals of licenses or leases for previously purchased commercial computer software.

15. Architect-Engineering contracts (see 11.3).

16. Repairs and improvements to leased postal facilities when performed pursuant to provisions of the lease.

17. Acquisitions and sales of real estate.

> 18. Contracts with Federally Funded Research and Development Centers (FFRDCs) and similar non-profit organizations, for theoretical analysis, exploratory studies, experiments in any field of science and technology, and for engineering or developmental work applying investigative findings and theories of a scientific or technical nature.

12. Chapter 10 of the Manual at Paragraph 10.1.1.a. reads as follows:

> Policy. It is Postal Service policy to encourage the participation of small, minority-owned and woman-owned businesses in the U.S.P.S. purchasing program.

13. Chapter 10 of the Manual at Paragraphs 10.1.4, 10.1.4.a, 10.1.4.b, and 10.1.4.c read as follows:

> 10.1.4 <u>Contracting with Minority-owned and Woman-owned Businesses</u>
>
> To help minority-owned and woman-owned businesses enter and maintain themselves in the marketplace, purchasing offices must establish procedures to accomplish the following:
>
> 10.1.4.a *Identification of Suitable Purchases.*
>
> Contracting officers should review and identify those requisitions suitable for competition among minority-owned and woman-owned businesses. One indication that a requisition is suitable is previous success in obtaining the supplies or services from minority-owned businesses or woman-owned businesses. Selection of requisitions must be consistent with purchasing objectives, and no quotas may be established.

10.1.4.b *Postal Estimate.*

When a requisition is selected, the contracting officer must establish a Postal Service price estimate, based on the price of the last competitive purchase of identical supplies or services, adjusted for any known or projected variation in the cost of labor and materials. If there has been no competitive purchase, the estimate must be based on the lowest price that might reasonably be expected from any efficient, experienced firm with proven capability, without taking into account any factors unique to minority-owned and woman-owned businesses.

10.1.4.c *Negotiation and Award.*

Contracting officers must solicit proposals from all minority-owned and woman-owned businesses found to be capable of performing the contract, using the procedures in 4.2 or 4.3. If only one minority-owned or woman-owned business is known to be capable, the procedures in 4.4 apply. The negotiated price may not exceed fair market value, taking into account the Postal Service estimate and other methods of cost and price analysis (see 5.3.3).

14. Chapter 10 of the Manual at Paragraphs 10.3.1, 10.3.2, 10.3.2a read as follows:

10.3.1 Policy

Postal Service policy is to give preference to domestic-source products and materials in purchasing supplies and services, in accordance with the provisions of this manual, which are based on the Buy American Act (41 U.S.C. 10a-d). With respect to individual procurements or procurement categories, the Postmaster General may adopt more stringent standards for domestic manufacture when required in the interest of the Postal Service.

10.3.2 Supplies

10.3.2.a *Applicability.*

The procedures in this part apply to all purchase of supplies, or services that involve the furnishing of supplies. Deviations may be authorized by the VP, Purchasing and Materials.

15. Chapter 10 of the Manual at Paragraphs 10.3.2.d and 10.3.2.e read as follows:

> 10.3.2.d *Proposal Evaluation*
>
> 1. If award is to be based solely on price and price-related factor, the procedures of paragraph e below are used for price comparison.
>
> 2. If factors other than price will have a significant weight in proposal evaluation, domestic-source end products should receive a preference in the case of closely ranked proposals, unless there are more important discriminators, but no price differential should be applied.
>
> 10.3.2.e *Price Comparison.*
>
> Each foreign price proposal must be adjusted for purposes of evaluation by adding to the foreign proposal (inclusive of duty) a factor of six percent of that proposal. If a tie results between a foreign proposal and a domestic proposal, the domestic proposal must be selected for award. When more than one line item is involved, the six percent evaluation factor is applied on an item-by-item basis, except that the factor may be applied to any group of items that the solicitation specifies will be awarded as a group.

16. PURE POWER is a manufacturer of top quality, environmentally friendly, re-usable oil filters, lubricants, and related products.

17. In early 1996, PURE POWER was contacted by U.S.P.S. and asked to take part in a costly two year testing program in which the PURE POWER reusable oil filtering system would be tested against a reusable oil filtering system manufactured by Glacier Metal Company Limited (hereafter "GLACIER").

18. The company who prevailed on the test was to be designated as the oil filter provider for the retrofit of Mack trucks being purchased by Postal Services as well as to retrofit previously purchased Mack trucks.

19. The testing was to be conducted by Mack Trucks, Inc., who equipped its trucks with the competing oil filters and then sent the used motor oil for testing to an independent laboratory.

20. The testing was completed in late November of 1998 and Mack Trucks, Inc. notified PURE POWER of the results in December of 1998. (See letter from Mack Trucks, Inc. to PURE POWER attached hereto as Exhibit "B" and made a part hereof by this reference.)

21. The testing established that:

(a) The PURE POWER filtering system was more effective in filtering harmful particles from engine motor oil than the GLACIER filtering systems;

(b) PURE POWER is a woman owned business;

(c) PURE POWER is a United States corporation; and

(d) The PURE POWER filtering system was priced below that of its competitor GLACIER.

22. PURE POWER is informed and believes and on that basis alleges that GLACIER is neither a minority-owned or woman-owned business.

23 PURE POWER is informed and believes and on that basis alleges that T.F. HUDGINS ("Hudgins") is a Texas corporation and the United States subsidiary of GLACIER and is neither a minority-owned or woman-owned business.

24 PURE POWER is informed and believes and on that basis alleges that GLACIER, at all times relevant herein, was a foreign corporation authorized to do business in the United States.

25 On or about January 1999, PURE POWER was informed and believed that, in spite of the test results and the purchasing criteria set forth in the Manual, U.S.P.S. selected GLACIER as the required replacement filter to be installed in all U.S.P.S. vehicles at U.S.P.S. vehicle maintenance facilities.

26 By letter of January 26, 1999, PURE POWER formally protested to U.S.P.S. that U.S.P.S. failed to adhere to their earlier agreement and their own purchasing procedures in designating GLACIER as the specified replacement oil filters on the Mack Trucks, Inc.'s contract. (Attached hereto as Exhibit "C" is a copy of the January 26, 1999 letter from PURE POWER to U.S.P.S. and is incorporated herein by this reference.)

27 By this letter, PURE POWER informed U.S.P.S. that U.S.P.S. had breached its agreement to award the winning test participant the retrofit designation.

28. By letter of April 29, 1999, the U.S.P.S. confirmed that the U.S.P.S. had, in fact, selected GLACIER as the vendor for purposes of supplying reusable filters to the U.S.P.S. (Attached hereto as Exhibit "D" is a copy of the April 29, 1999 letter from U.S.P.S. to PURE POWER and is incorporated herein by this reference.)

29. By letter of June 23, 1999, U.S.P.S. notified PURE POWER of their final determination on this matter, specifically that it found no wrongdoing or violation of policy and that it was considering the matter closed. (Attached hereto as Exhibit "E" is a copy of the June 23, 1999 letter from U.S.P.S. to PURE POWER and is incorporated herein by this reference.)

30. Prior to the above-described facts and circumstances that have given rise to this dispute, PURE POWER had been selling a substantial amount of its products to individual U.S.P.S. vehicle maintenance facilities who had been previously authorized by U.S.P.S. to make such purchases.

31. Since the commencement of this dispute and subsequent litigation, the U.S.P.S. vehicle maintenance facilities have all but ceased doing any business with PURE POWER.

32. PURE POWER is informed and believes and based thereon alleges that the cessation of orders from U.S.P.S. vehicle maintenance facilities is the result of improper and retaliatory conduct on the part of U.S.P.S. and is an intentional interference with a prospective economic advantage previously enjoyed by PURE POWER with various individual U.S.P.S. vehicle maintenance facilities.

## FIRST CAUSE OF ACTION

## (Violation of U.S.P.S. Policy and Procedure Entitling Plaintiff to Injunctive Relief and Damages)

33. Plaintiff incorporates through reference paragraphs 1 through 32 of this Complaint into this first cause of action as if set forth fully herein.

34. Plaintiff is informed and believes and on that basis alleges that GLACIER, HUDGINS, U.S.P.S. and DOES 1 through 10, by and through their respective agents, representatives and employees conspired to award the U.S.P.S. Oil Filter Supply Contract to GLACIER regardless of the outcome of the testing program.

35. Plaintiff alleges that, by the above-described acts, defendant U.S.P.S. acted improperly and in violation of U.S.P.S. Policy and Procedure as set out in the U.S.P.S Manual.

36. Plaintiff alleges that, as a result of defendant U.S.P.S.'s violation of U.S.P.S. Policy and Procedure, plaintiff has been damaged in the form of time and money expended in participating in the two (2) year testing program in an amount to be established according to proof at trial.

37. Plaintiff alleges that it has incurred legal fees and costs in protesting this procurement decision in an amount to be established according to proof at trial.

38. Plaintiff alleges that, as a result of defendant U.S.P.S.'s violation of U.S.P.S. Policy and Procedure, plaintiff has been damaged in the form of lost profits resulting from U.S.P.S. purchasing GLACIER product rather than PURE POWER product during the period of December 1997 until the present.

39. Plaintiff alleges that, as a result of defendant U.S.P.S.'s violation of U.S.P.S. Policy and Procedure, plaintiff will continue to be damaged so long as U.S.P.S. is not restrained from continuing to do business with GLACIER and ordered to begin purchasing product from plaintiff or other equally qualified suppliers. The amount of these damages is uncertain and supports the imposition of an injunction.

40. An injunction is necessary to prevent irreparable harm to the plaintiff, for which plaintiff would otherwise have no adequate remedy at law.

41. As a further violation by U.S.P.S. of its policies and procedures, U.S.P.S. has wrongfully interfered in the preexisting economic relationship that PURE POWER enjoyed with various U.S.P.S. vehicle maintenance facilities which resulted in PURE POWER losing substantial business in an amount to be established according to proof at trial.

## SECOND CAUSE OF ACTION

## (Breach of Contract)

42. Plaintiff incorporates through reference paragraphs 1 through 41 of this Complaint into this Second Cause of Action as if set forth fully herein.

43. On or about January of 1996, U.S.P.S. represented to plaintiff that, if PURE POWER took part in an oil filter testing program, PURE POWER would be designated as the sole source for retrofits of oil filters on Mack trucks purchased and to be purchased by U.S.P.S., provided PURE POWER prevailed over competing filters in the testing program.

44. PURE POWER fully performed all covenants and conditions set forth in the agreement by taking part in the tests and outperforming all its competitors.

45. Despite PURE POWER's successful performance, U.S.P.S. breached the aforesaid agreement by selecting the GLACIER Spinner brand filters to be used in retrofitting the Mack trucks.

46. Plaintiff alleges that, as a result of defendant U.S.P.S.'s breache, plaintiff has been damaged in the form of time and money expended in participating in the two-year testing program in an amount to be established according to proof at trial.

47. Plaintiff alleges that, as a result of defendant U.S.P.S.'s breach, plaintiff has been damaged in the form of lost profits resulting from U.S.P.S. purchasing GLACIER product rather than PURE POWER product during the period of December 1997 until the present.

48. Plaintiff is informed and believes and thereon alleges that U.S.P.S. further breached the agreement by not only failing to designate PURE POWER as the specified oil filter in the Mack Trucks, Inc. contract but also in failing to designate PURE POWER products as the preferred products to be ordered by U.S.P.S. vehicle maintenance facilities and, in fact, taking steps to discourage U.S.P.S. vehicle maintenance facilities from purchasing any products from PURE POWER.

**WHEREFORE, plaintiff PURE POWER prays for Judgment against defendants as follows:**

**First Cause of Action Against Defendants:**

1. For an injunction restraining U.S.P.S. from purchasing oil filters from GLACIER and/or its affiliates and requiring all future purchases be made from plaintiff;

2. For special damages in an amount to be established according to proof at trial;

3. For reasonable attorney's fees according to proof at trial;

4. For costs of suit incurred according to proof at trial; and

5. For such other and further relief as the Court may deem just and proper.

**Second Cause of Action Against Defendants:**

1. For contract damages in an amount to established according to proof at trial;

2. For costs incurred in performing under the contract in an amount to be established according to proof at trial.

3. For reasonable attorney's fees according to proof at trial;

4. For costs of suit incurred according to proof at trial; and

5. For such other and further relief as the Court may deem just and proper.

**LAW OFFICES OF MICHAEL J. BULEY**

Dated: June 13, 2005

By: ______________________________

Michael J. Buley, Esq.
Law Offices of Michael J. Buley
20271 S. W. Birch Street, Suite 100
Newport Beach, California 92660
Telephone: (949) 752-1161
Facsimile: (949) 251-0337

Attorney for PURE POWER, INC.

# EXHIBIT "A"

EXHIBIT "A"

91-375 (codified at Title 39 of the United States Code), to provide postal services to bind the nation together. The Postal Service does so in an environment unique for a government entity; it operates almost entirely from its own revenues, and is subject to direct and indirect competition from businesses and competing communications technologies across its entire product line. As a result, the Postal Service's business operations are driven by concerns such as service need and market share.

1.7.1.b Consistent with these circumstances, the Postal Service has been granted broad power to determine the character of and necessity for its expenditures, and to enter into and perform contracts upon terms and conditions and in the manner it deems necessary to accomplish its purposes. In order that it may operate in a business-like fashion, the Postal Service has been exempted from most federal laws dealing with public or federal contracts, property, works, officers, employees, budgets, or funds, including specifically laws regarding the establishment, adjudication, and judicial review of administrative procedures and determinations. While the Postal Service has adopted, as a matter of policy, various federal procurement practices not otherwise applicable to it, it has also undertaken to integrate into its purchasing procedures the business-related objectives reflected in its enabling legislation, while retaining standards of fairness and openness regarding its transactions appropriate to its status as a public entity.

1.7.1.c The Postal Service has established this PM, reflecting its business purposes, with the objective of acting efficiently and effectively to obtain at reasonable cost goods and services of appropriate quality to support its operations as a service to the people of the United States.

1.7.1.d The policies and procedures established by the PM are intended to further the objectives expressed herein, but are not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable by a party against the Postal Service or the United States, or their officers or employees, except to the extent expressly provided within the PM.

## 1.7.2 Competition

1.7.2.a Purchases must be made on the basis of adequate competition whenever feasible. Adequate competition means the solicitation and participation of a sufficient number of capable sources to ensure that the required quality and quantity of goods and services is obtained when needed, and that the price is fair and reasonable.

1.7.2.b Contracting officers, supported by such assistance as is necessary, must make a determination that adequate competition has been obtained in any instance in which it is required. In making that determination, contracting officers must act with reasoned discretion, taking into account both the business requirements of the particular procurement and the Postal Service's general interest in identifying new suppliers and in providing opportunities for its supplier base.

1.7.2.c The examples which follow are not necessarily inconsistent with the obtaining of adequate competition:

1. Rotation of source lists when there are a number of qualified suppliers (see A.3.3);
2. The failure to publicize, due to urgency, a procurement otherwise required to be publicized (see 3.2.1);
3. Purchases from approved sources or prequalified suppliers (see 3.1.6); and
4. Purchases from minority and woman-owned businesses (see 10.1.4).

### 4.3.9 Administration

4.3.9.a *General.* Purchases must be administered in accordance with the terms and conditions of the order or agreement. The requirements of chapter 6 are applicable except as qualified in this section 4.2.

4.3.9.b *Cancellation*

1. An order placed by accepting a proposal is a contract that may be cancelled or terminated by the parties only according to its terms unless the parties mutually agree to the action. See 6.9.2 (termination for convenience), 6.9.3 (termination for default), and 6.9.1.c (no-cost cancellation).
2. A purchase order is an offer by the Postal Service to purchase that may be cancelled or withdrawn by the Postal Service in whole or part before acceptance by the contractor. Acceptance of a purchase order occurs when:
   (a) A written acceptance is mailed or otherwise furnished by the contractor; or
   (b) The contractor begins performance of the work called for by the purchase order.If a contractor does not accept a notice of cancellation and presents satisfactory evidence that acceptance of the purchase order had occurred before receipt of the notice, the contracting officer must either proceed to terminate the contract for convenience or allow performance to continue.
3. Examples of situations in which cancellation may be necessary include administrative error and changed requirements.
4. Cancellation must be done in writing, by letter or telegram, or by amendment of the solicitation.

## SECTION 4 NONCOMPETITIVE PURCHASING

### 4.4.1 General

4.4.1.a *Definition.* A noncompetitive purchase is any purchase of supplies or services from one source without competition.

4.4.1.b *Limitations on Use.* Noncompetitive purchasing methods may be used only when competitive purchasing is not feasible or appropriate.

4.4.1.c *Applicability.* This section applies to all purchases except:

1. Orders placed against mandatory national and area contracts (see 3.1.4).
2. Purchases from a single approved source (where only one source is approved; see 3.1.6.b).
3. Orders placed under indefinite-delivery contracts (see 5.1.5).
4. Purchases not exceeding the competitive threshold (see 4.3.1.d).
5. Orders placed against GSA's Federal Supply Schedules and from other non-GSA government sources, including Federal Prison Industries (see 3.1.5). Group 70 and Group 58 IRMS FIPS schedule contracts (see 3.1.5.b.3) do not fall within this exception.

6. Purchases of supplies and services from qualified workshops (as determined by the Committee for Purchase from People who are Blind or Severely Disabled) who are employing people who are blind or severely disabled (see 3.1.3).
7. Contracts with any federal, state, or local government agencies.
8. Contracts with firms that provide supplies or services (such as utilities and passenger or general freight transportation services, but not including the transportation of mail) subject to uniform tariff, government regulation or areawide rates.
9. Institutional memberships authorized by Employee and Labor Relations Manual (ELM) 750, exhibition fees, booth space, and attendance at outside conferences.
10. Subscriptions and renewals of subscriptions to periodicals and serial publications (includes electronic information service subscriptions).
11. Advertisements.
12. Certain repurchases against a defaulted contractor's account (see 6.10.1.b.3).
13. Modifications within the scope of a contract or the exercise of contractual options, such as lease extensions and renewal options.
14. Modifications, enhancements, upgrades, maintenance, and renewals of licenses or leases for previously purchased commercial computer software.
15. Architect-Engineering contracts (see 11.3).
16. Repairs and improvements to leased postal facilities when performed pursuant to provisions of the lease.
17. Acquisitions and sales of real estate.
18. Contracts with Federally Funded Research and Development Centers (FFRDCs) and similar nonprofit organizations, for theoretical analysis, exploratory studies, experiments in any field of science and technology, and for engineering or developmental work applying investigative findings and theories of a scientific or technical nature.

## 4.4.2 Justification

4.4.2.a *Circumstances.* Circumstances under which noncompetitive purchasing may be appropriate and justified include:

1. Demonstration, after adequate investigation, of the existence of only one source capable of meeting Postal Service requirements;
2. Spare parts or replacements of specified makes and models when required for standardization or when specifications or data needed for competition are lacking;
3. Unusual and compelling urgency, when delay would seriously harm the Postal Service;
4. Requirement of a brand-name commercial product for authorized resale;
5. Acceptance of an unsolicited proposal; and
6. When competitive purchasing would not be in the interest of the Postal Service.

# Chapter 10
# Socioeconomic Policies


Section 1 Small, Minority-owned and Woman-owned Businesses ........ 243

10.1.1 General ........ 243

10.1.1.a Policy ........ 243

10.1.1.b Definitions ........ 243

10.1.2 Requirements ........ 244

10.1.3 Identification of Sources ........ 244

10.1.4 Contracting with Minority-owned and Woman-owned Businesses ........ 244

10.1.4.a Identification of Suitable Purchases ........ 244

10.1.4.b Postal Estimate ........ 244

10.1.4.c Negotiation and Award ........ 245

10.1.5 Subcontracting with Small, Minority-owned and Woman-owned Businesses ........ 245

10.1.5.a General ........ 245

10.1.5.b Solicitation Provision ........ 245

10.1.5.c Clauses ........ 245

10.1.5.d Reports ........ 245

Section 2 Labor Policies ........ 245

10.2.1 Basic Labor Policies ........ 245

10.2.2 Convict Labor ........ 246

10.2.2.a Policy ........ 246

10.2.2.b Clause ........ 246

10.2.3 Contract Work Hours and Safety Standards Act ........ 246

10.2.3.a Requirement ........ 246

10.2.3.b Exemptions ........ 246

10.2.3.c Clause ........ 246

10.2.3.d Enforcement ........ 246

10.2.4 Construction Contracts and Lease Agreements ........ 247

10.2.4.a Definitions ........ 247

10.2.4.b Labor Standards for Construction ........ 247

10.2.4.c Labor Standards for Leases ........ 248

10.2.4.d Clauses ........ 248

10.2.4.e Administration and Enforcement ........ 248

10.2.5 Walsh-Healey Public Contracts Act ........ 252

10.2.5.a General ........ 252

10.2.5.b Requirement ........ 252

10.2.5.c Solicitation Provision ........ 252

10.2.5.d Clause ........ 252

10.2.5.e Exemptions ........ 252

10.2.5.f Definitions ........ 252

10.2.5.g Agents. ........ 253

10.2.5.h Determining Eligibility of Offerors ........ 253

10.2.5.i Protests ........ 254

10.2.5.j Other Responsibilities ........ 255

Case 1:05-cv-00559-CCM Document 5 Filed 06/14/2005 Page 22 of 62




10.2.5.k Exceptions to Required Stipulations ........ 255
10.2.6 Fair Labor Standards Act of 1938 ........ 255
10.2.6.a General ........ 255
10.2.6.b Inquiries About the Act ........ 255
10.2.7 Equal Employment Opportunity ........ 255
10.2.7.a General ........ 255
10.2.7.b Exempt Contracts ........ 256
10.2.7.c Preaward Compliance Reviews ........ 257
10.2.7.d Affirmative Action Programs ........ 257
10.2.7.e Poster ........ 258
10.2.7.f Inquiries ........ 258
10.2.7.g Complaints ........ 258
10.2.7.h Enforcement ........ 258
10.2.7.i Solicitation Provisions ........ 259
10.2.7.j Clauses ........ 259
10.2.8 Workshops for People who are Blind or Severely Disabled ........ 259
10.2.9 Blind Persons' Priority for Food Vending Services ........ 259
10.2.10 Service Contract Act ........ 259
10.2.10.a General ........ 259
10.2.10.b Exemptions ........ 260
10.2.10.c Clauses ........ 261
10.2.10.d Notice of Intent to Make a Service Contract ........ 261
10.2.10.e Minimum Wage Determinations ........ 261
10.2.10.f Notice of Award ........ 263
10.2.10.g Department of Labor Poster ........ 263
10.2.10.h Inquiries Concerning the Act ........ 263
10.2.10.i Withholding Contract Payments and Contract Termination ........ 263
10.2.10.j List of Violators ........ 264
10.2.11 Employment of the Handicapped ........ 264
10.2.11.a Policy ........ 264
10.2.11.b Applicability ........ 264
10.2.11.c Department of Labor Notices ........ 264
10.2.11.d Collective Bargaining Agreements ........ 264
10.2.11.e Complaints ........ 264
10.2.11.f Department of Labor Sanctions ........ 264
10.2.12 Veterans ........ 265
10.2.12.a Requirement ........ 265
10.2.12.b Applicability ........ 265
10.2.12.c Department of Labor Notices ........ 265
10.2.12.d Complaints ........ 265
10.2.12.e Department of Labor Sanctions ........ 265
Section 3 Buy American Policy ........ 266
10.3.1 Policy ........ 266
10.3.2 Supplies ........ 266
10.3.2.a Applicability ........ 266
10.3.2.b Definitions ........ 266
10.3.2.c Requirement ........ 266
10.3.2.d Proposal Evaluation ........ 267
10.3.2.e Price Comparison ........ 267
10.3.2.f Solicitation Provision ........ 267
10.3.2.g Clause ........ 267

10.3.3 Construction Materials .......... 267
10.3.3.a Applicability .......... 267
10.3.3.b Definitions .......... 267
10.3.3.c Requirement .......... 267
10.3.3.d Solicitation Provision .......... 268
10.3.3.e Clause .......... 268
10.3.4 List of Excepted Articles and Materials .......... 268
10.3.4.a Crude oil .......... 269
10.3.4.b Finished products .......... 269
10.3.4.c Unfinished oils .......... 269

Section 4 Clean Air Act and Clean Water Act .......... 269
10.4.1 General .......... 269
10.4.2 Requirements .......... 270

Section 5 Drug-Free Workplace .......... 270
10.5.1 General .......... 270
10.5.1.a Policy .......... 270
10.5.1.b Definitions .......... 270
10.5.2 Applicability .......... 270
10.5.3 Exceptions .......... 271
10.5.4 Requirements .......... 271
10.5.5 Sanctions .......... 271
10.5.5.a Suspension of Payments .......... 271
10.5.5.b Termination, Suspension and Debarment .......... 271

# Chapter 10 Socioeconomic Policies

## Section 1 Small, Minority-owned and Woman-owned Businesses

### 10.1.1 General

10.1.1.a *Policy.* It is Postal Service policy to encourage the participation of small, minority-owned and woman-owned businesses in the USPS purchasing program

10.1.1.b *Definitions*

1. *Small Business.* A business, including an affiliate, that is independently owned and operated, is not dominant in producing or performing the supplies or services being purchased, and has no more than 500 employees, unless a different size standard has been established by the Small Business Administration (see 13 CFR 121, particularly for different size standards for airline, railroad, and construction companies). For subcontracts of $50,000 or less, a subcontractor having no more than 500 employees qualifies as a small business without regard to other factors.
2. *Affiliates.* Businesses connected by the fact that one controls or has the power to control the other, or a third party controls or has the power to control both. Factors such as common ownership, common management, and contractual relationships must be considered. Franchise agreements are not considered evidence of affiliation if the franchisee has a right to profit in proportion to its ownership and bears the risk of loss or failure.
3. *Dominant.* Being a controlling or major influence in a market in which a number of businesses are primarily engaged. Factors such as business volume; number of employees; financial resources; competitiveness; ownership or control of materials, processes, patents, and license agreements; facilities; sales territory; and nature of the business must be considered.
4. *Minority-owned business.* A concern that is at least 51 percent owned by, and whose management and daily business operations are controlled by, one or more members of a socially and economically disadvantaged minority group, namely U.S. citizens who are Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, or Asian-Indian Americans. (Native Americans are American Indians, Eskimos, Aleuts, and Native Hawaiians. Asian-Pacific Americans are U.S. citizens whose origins are Japanese, Chinese, Filipino, Vietnamese, Korean, Samoan, Laotian, Kampuchean, Taiwanese or in the U.S. Trust Territories of the Pacific Islands. Asian-Indian Americans are U.S. citizens whose origins are in the Indian subcontinent.)

5. *Woman-owned business.* A concern at least 51 percent of which is owned by a woman (or women) who is a U.S. citizen, controls the firm by exercising the power to make policy decisions, and operates the business by being actively involved in day-to-day management.
6. *Number of employees.* Average employment (including domestic and foreign affiliates), based on the number of people employed (whether full-time, part-time, or temporary), during each pay period of the preceding 12 months, or, if the business has been in existence less than 12 months, during each pay period of its existence.

## 10.1.2 Requirements

Contracting officers must:

10.1.2.a Provide an opportunity for small, minority-owned and woman-owned businesses to compete, by including them on mailing lists, allowing reasonable proposal preparation time, and establishing realistic delivery schedules; and

10.1.2.b Encourage prime contractors to subcontract with small businesses.

## 10.1.3 Identification of Sources

Market research (see 2.1.2) must be performed to identify small, minority-owned and woman-owned businesses for solicitation mailing lists and other source files. Contracting officers may also ask the Small Business Administration and the Department of Commerce's Minority Business Development Agency to identify small, minority-owned and woman-owned business sources for a specific procurement, and to provide information on their qualifications and capabilities.

## 10.1.4 Contracting with Minority-owned and Woman-owned Businesses

To help minority-owned and woman-owned businesses enter and maintain themselves in the marketplace, purchasing offices must establish procedures to accomplish the following:

10.1.4.a *Identification of Suitable Purchases.* Contracting officers should review and identify those requisitions suitable for competition among minority-owned and woman-owned businesses. One indication that a requisition is suitable is previous success in obtaining the supplies or services from minority-owned businesses or woman-owned businesses. Selection of requisitions must be consistent with purchasing objectives, and no quotas may be established.

10.1.4.b *Postal Estimate.* When a requisition is selected, the contracting officer must establish a Postal Service price estimate, based on the price of the last competitive purchase of identical supplies or services, adjusted for any known or projected variation in the cost of labor and materials. If there has been no competitive purchase, the estimate must be based on the lowest price that might reasonably be expected from any efficient, experienced firm with proven capability, without taking into account any factors unique to minority-owned and woman-owned businesses.

10.1.4.c *Negotiation and Award.* Contracting officers must solicit proposals from all minority-owned and woman-owned businesses found to be capable of performing the contract, using the procedures in 4.2 or 4.3. If only one minority-owned or woman-owned business is known to be capable, the procedures in 4.4 apply. The negotiated price may not exceed fair market value, taking into account the Postal Service estimate and other methods of cost and price analysis (see 5.3.3).

### 10.1.5 Subcontracting with Small, Minority-owned and Woman-owned Businesses

10.1.5.a *General.* To realize the benefits of a board supply base, contracting officers must require contractors to encourage the participation of small, minority-owned and woman-owned businesses as subcontractors to the maximum extent consistent with efficient contract performance. Small businesses are exempt from the submission of formal subcontracting plans as required in Provision 10-1, *Notice of Small, Minority-owned and Woman-owned Subcontracting Requirements* and Clause 10-2, *Small, Minority-owned and Woman-owned Subcontracting Requirements.*

10.1.5.b *Solicitation Provision.* For contracts estimated to exceed $1,000,000 ($500,000 for construction), solicitations must include Provision 10-1, *Notice of Small, Minority-owned and Woman-owned Business Subcontracting Requirements.*

10.1.5.c *Clauses*

1. Clause 10-1, *Participation of Small, Minority-owned and Woman-owned Business,* must be included in all contracts except purchases made using simplified procedures (see 4.3) and contracts for professional services.
2. Contracts over $1,000,000 ($500,000 for construction) must include Clause 10-2, *Small, Minority-owned and Woman-owned Business Subcontracting Requirements.*

10.1.5.d *Reports.* Purchasing offices must compile and report, quarterly, on the number and dollar value of subcontracts and purchase orders placed by postal contractors with small, minority-owned and woman-owned businesses. Reports are to be forwarded, through channel, to the department's representative on the Socioeconomic Committee.

## Section 2 Labor Policies

### 10.2.1 Basic Labor Policies

Purchasing offices must:

10.2.1.a Maintain good relations with industry and labor so that Postal Service purchasing requirements may be met without delay;

10.2.1.b Be impartial in any dispute between contractor management and labor, and not try to conciliate, mediate, or arbitrate a labor dispute;

10.2.1.c Cooperate fully with the Department of Labor's investigation and enforcement activities; and

10.2.1.d Cooperate fully with federal and state agencies responsible for enforcing requirements in such areas as safety, health and sanitation, work hours and minimum wages, equal employment opportunity, and child and convict labor.

## 10.2.2 Convict Labor

10.2.2.a *Policy.* Under 39 U.S.C. 2201, the Postal Service may not contract for supplies to be manufactured by convict labor, except for purchase from Federal Prison Industries, Inc. (see 3.1.5). The Postal Service may purchase supplies from firms employing persons on parole or probation under the conditions set forth in Executive Order 11755, December 29, 1973, which the Postal Service has elected to follow.

10.2.2.b *Clause.* Except for purchases from Federal Prison Industries, Inc., all contracts involving the employment of labor must contain Clause 10-3, *Convict Labor.*

## 10.2.3 Contract Work Hours and Safety Standards Act

10.2.3.a *Requirement.* The Contract Work Hours and Safety Standards Act (40 U.S.C. 327–333) requires that certain contracts contain a clause specifying that no laborer or mechanic doing any work under the contract may be required or permitted to work more than 40 hours in any workweek unless paid at least one and one-half times the basic rate of pay for all overtime hours. A violation makes the contractor liable for liquidated damages. Lease agreements, being subject to Reorganization Plan No. 14 of 1950 under 39 U.S.C. 410(d), are subject to the safety standards of the Act in addition to the overtime pay requirements.

10.2.3.b *Exemptions.* The Secretary of Labor is responsible for enforcement of the Act and may permit variations and exemptions from the Act's requirements when necessary in the public interest or to prevent injustice or undue hardship (29 CFR 5.14).

10.2.3.c *Clause.* Clause 10-4, *Contract Work Hours and Safety Standards Act — Overtime Compensation*, must be included in all contracts, lease agreements, and ordering agreements that may involve the employment of laborers or mechanics, except:

1. Construction contracts and lease agreements involving alterations or improvements of $2,000 or less, and other contracts and lease agreements of $2,500 or less;
2. Indefinite delivery contracts and ordering agreements, if the total amount of all orders placed for one year after the effective date will not exceed the limits in subparagraph c.1 above:
3. Contracts for supplies usually purchased in the open market or requiring labor merely incidental to the sale;
4. Contracts for work subject solely to the Walsh-Healey Public Contracts Act (see 10.2.5);
5. Contracts for transportation by land, air, or water; and
6. Any other contracts exempt under regulations of the Secretary of Labor (see 29 CFR 5.15).

10.2.3.d *Enforcement.* Investigation and enforcement will be in accordance with 10.2.4.e.6 and 7.

## 10.2.4 Construction Contracts and Lease Agreements

### 10.2.4.a Definitions

1. *Construction.* Defined in 11.5.1.a. For purposes of this part 10.2.4, this definition:

   (a) Applies only if the work is performed at a specified work site, so that wage rates can be determined for the locality;

   (b) Does not apply to construction so closely related to research, experiment, and development that it cannot be performed separately, or is itself the subject of research, experiment, or development;

   (c) Does not apply to manufacturing or furnishing equipment, components, or other materials, except manufacturing or fabricating construction materials and components on site by a construction contractor or subcontractor under a contract that otherwise meets the definition; and

   (d) Does not apply to contracts solely for dismantling, demolishing, or removing improvements, unless further work that will result in the construction, alteration, or repair of a building or work at that location is contemplated.

2. *Laborers and mechanics.* People who work predominantly with their hands or with construction tools and equipment. In this part, the term includes working foremen, apprentices, trainees, helpers, watchmen, guards, firefighters, fireguards, cooks, and storekeepers.

3. *Work site.* The place where a construction contract is performed, and adjacent or nearby sites of job headquarters, storage yards, prefabrication or assembly yards, quarries or borrow pits, batch plants, and similar facilities set up to serve the contract operation exclusively. Transportation of materials, equipment, or personnel to and from the construction site by employees of construction contractors or subcontractors is included, but transportation by common carriers, material suppliers, or manufacturers is not.

### 10.2.4.b Labor Standards for Construction

1. *Davis-Bacon Act.* The Davis-Bacon Act (40 U.S.C. 276a et seq.) requires that construction contracts over $2,000 contain a provision setting the minimum wages to be paid to all classes of laborers and mechanics working on the work site. Minimum wage rates are determined by the Secretary of Labor on the basis of prevailing wage rates.

2. *Copeland Act.* The Copeland Anti-Kickback Act (18 U.S.C. 874 and 41 U.S.C. 276(c)) applies to any contract over $2,000 subject to the Davis-Bacon Act. The Copeland Act makes it unlawful to force laborers or mechanics to give up any part of their compensation except for permissible deductions such as taxes and union dues.

3. *Contract Work Hours and Safety Standards Act.* The overtime pay requirements of the Contract Work Hours and Safety Standards Act (see 10.2.3.a) apply to all construction contracts and lease agreements involving the employment of laborers and mechanics in construction work, with the exceptions described in 10.2.3.c.

4. *Department of Labor Regulations.* Regulations covering the administration and enforcement of these laws are published by the Department of Labor in 29 CFR 3 and 5.

5. *Other Contracts Involving Construction.* The labor standards and regulations described in subparagraphs b.1 through b.4 above do not apply to contracts for supplies, services, maintenance, research and development, or other nonconstruction requirements, unless the contracts also involve construction. The labor standards in this part apply whenever such a contract specifically requires substantial construction work, or a substantial amount of construction work will be necessary to meet the requirements, and the construction work is performed separately from the rest of the contract work. ("Substantial" refers to the type and quantity of construction, not merely its total value in relation to the contract price.) The contract must specifically identify the work covered by the labor standards.

10.2.4.c *Labor Standards for Leases*

1. *Davis-Bacon Act.* The Davis-Bacon Act requirements for minimum wages for laborers and mechanics (see subparagraph b.1 above) apply to any lease of, or agreement to lease, interior space netting more than 6,500 square feet.
2. *Work Hours and Safety Standards*
   (a) The Contract Work Hours and Safety Standards Act requirements for overtime pay apply to all leases except those described in 10.2.3.c. The Act's health and safety standards apply to all leases and agreements to lease, regardless of building size or rental amount, that involve the employment of laborers or mechanics in construction work.

   (b) These requirements apply not only to laborers and mechanics employed at the work site but to any laborers or mechanics working under the contract, including subcontractors furnishing supplies or materials if the work is performed directly on or adjacent to the work site or fabricated specifically for the project.

10.2.4.d *Clauses*

1. *Construction Contracts.* Construction contracts over $2,000 must include:
   (a) Clause 10-4, *Contract Work Hours and Safety Standards Act — Overtime Compensation*; and

   (b) Clause 10-5, *Davis-Bacon Act.*
2. *Construction Contracts with States.* If a construction contract over $2,000 is with a state or a political subdivision of a state, the contract must include Clause 10-6, *Compliance by States with Labor Standards.*
3. *Leases*
   (a) All leases and agreements to lease involving construction work by laborers or mechanics must contain Clause 10-7, *Contract Work Hours and Safety Standards Act — Safety Standards.*

   (b) All leases and agreements to lease involving more than $2,000 of construction work by laborers or mechanics must contain Clause 10-4, *Contract Work Hours and Safety Standards Act — Overtime Compensation.*

   (c) All leases and agreements to lease interior space netting more than 6,500 square feet and involving construction work over $2,000 must include Clause 10-5, *Davis-Bacon Act.*

10.2.4.e *Administration and Enforcement*

1. *General.* Contracting officers must make sure that contractors and lessors are fully informed of the labor standards provisions in their contracts and

their responsibilities under those provisions. Unless it is clear that the contractor or lessor is already fully informed, the contractor or lessor must be informed by conference or letter as soon as possible after the contract is awarded.

2. *Applicability.* The following requirements apply to all contracts and leases containing the clauses prescribed in paragraph d above.

3. *Wage Determinations*

   (a) *General Wage Determinations.* Unlike project wage determinations, general wage decisions do not expire, but are modified or superseded to keep them current. They are available by subscription from the Department of Labor. A general wage determination may be requested for an area where none presently exists if a large number of contracts for a specific type of construction are expected in that area.

   (b) *Project Wage Determinations.* If no general wage determination is applicable to a project, the contracting officer must request a project wage determination from the local Regional Administrator, Department of Labor, using Standard Form 308, *Request for Determination and Response to Request.*

   (c) *Time for Making Requests.* Whenever possible, the contracting officer must request any needed wage determination in sufficient time to receive it for inclusion in the solicitation, normally 30 days before the date planned for issuance of the solicitation.

   (d) *Incorporation by Amendment.* If a wage determination cannot be obtained before issuing the solicitation, it may be incorporated in the solicitation by an amendment furnished to all offerors. If there is not enough time to issue an amendment before proposals are due, and the due date for proposals cannot be extended, the amendment must be a subject of discussions (see 4.2.5.g) and included in the request for best and final offers.

   (e) *Limitations.* Project wage determinations are effective for 120 days from the date of the determination. If a project wage determination will expire before a contract or lease agreement can be awarded, the contracting officer must request a new determination in time for it to be included in a solicitation amendment before proposals are due.

   (f) *Extensions.* The Department of Labor may extend the effective period of a wage determination that expired after proposals were due but before award. The request must be submitted to the Solicitor of Labor with a finding by the vice president of Facilities, that the wage determination expired unavoidably and an extension is necessary and proper in the public interest to prevent injustice or undue hardship or to avoid serious impairment in the conduct of Postal Service business.

   (g) *Modifications.* Any modification of a wage determination by the Department of Labor must be made part of the contract or lease agreement if received before award, using the procedures in (d) above.

   (h) *Posting.* The contracting officer must instruct the contractor to post a copy of the wage determination in a prominent place at the work site where it can easily be seen by the workers.

   (i) *Additional Classifications.* Any class of laborers or mechanics working under the contract but not listed in the wage determination must be classified or reclassified to conform to the wage determination.

Whatever action is taken must be reported in the Department of Labor. If there is any disagreement about the proper classification or reclassification, the contracting officer must submit the question, with a recommendation, to the Secretary of Labor for final determination.

4. *Subcontracts.* The contracting officer must obtain a list of all subcontracts, with descriptions of the work to be done under each, to assist in the payroll review required under subparagraph e.5 below.

5. *Payrolls and Compliance Statements*

   (a) *Submissions.* Contractors, or lessors, and subcontractors must submit copies of weekly payrolls to the contracting officer within seven days after the payroll payment dates. They must also submit weekly compliance statements required by the Copeland Act regulations (see 29 CFR 3.3).

   (b) *Examination.* The contracting officer must examine the payrolls and statements to make sure the contractors, lessors, and subcontractors comply with contract, statutory, and regulatory requirements.

   (c) *Retention.* Payrolls and compliance statements must be retained for three years from the contract completion date and produced to the Department of Labor upon request.

6. *Investigations*

   (a) The contracting officer must make whatever investigations are necessary to ensure compliance with contract, statutory, and regulatory requirements. Contracts of six months or less must be investigated before final payment is made, if possible. Longer contracts and lease agreements must be investigated as often as necessary to ensure compliance. Investigations must include interviews with employees on a sampling basis.

   (b) Special detailed investigations must be made when there are complaints or other evidence of violations. Complaints must be given priority.

   (c) Written or oral statements made by an employee must be kept confidential and may not be disclosed to the employer without the employee's consent.

7. *Enforcement Reports*

   (a) If underpayments total less than $1,000, are not willful, and have been made good to the employees, the contracting officer must submit a factual summary report to the Department of Labor in accordance with 29 CFR 5.7(a)(1), unless the Department did not request any future compliance investigation.

   (b) If underpayments total $1,000 or more or are willful, the contracting officer must submit as soon as possible a detailed enforcement report to the Secretary of Labor through the Inspection Service. The report must include a statement of findings about the violations and information about restitution, payment deductions, and contract terminations, as well as the names and addresses of the workers, lessors, contractors, and subcontractors concerned.

   (c) If there is substantial evidence that violations are willful and violate the False Affidavits Act (18 U.S.C. 1001) or another criminal statute, the matter must be referred to the Inspection Service, the Attorney General, and the Secretary of Labor.

8. *Semiannual Enforcement Reports.* The VP, Facilities, must submit semiannual reports to the Secretary of Labor on compliance with and enforcement of labor standards and prevailing wage determinations. A copy of each report must be furnished to the Inspection Service. Reports for the period January 1–June 30 are due by July 31, and reports for the period July 1–December 31 are due by January 31.

9. *Suspensions and Deductions of Contract Payments.* If a contractor, lessor, or subcontractor fails or refuses to pay all or any part of the wages due workers, the contracting officer may suspend contract or rent payments in amounts equal to the unpaid wages and liquidated damages that may be due, until restitution has been made or deductions against payment vouchers are made as provided in this paragraph. If failure or refusal to pay continues or appears to be willful or there is failure or refusal to comply with other contract, statutory, or regulatory requirements, the contracting officer may suspend contract or rent payments until violations stop. If restitution is not made within a reasonable time or before final payment under the contract or lease agreement, the contracting officer must send the information service center a report on Standard Form 1093, *Schedule of Withholdings Under the Davis-Bacon Act, and/or the Contract Work Hours and Safety Standards Act*, stating the amounts to be withheld for underpayment of wages and liquidated damages. These amounts must be deducted from the payments made to the contractor or lessor and disposed of in accordance with the contracting officer's instructions.

10. *Restitution.* Contractors, lessors, or subcontractors may make restitution of amounts due workers at any time. If wages were underpaid, the contracting officer must ask the contractor to make restitution to the employees or to plans, funds, or programs for any type of fringe benefit listed in the wage determination.

11. *Contract Termination*

    (a) *Construction Contracts.* Whenever a contract is terminated for labor standards violations, the contracting officer must send a report to the Secretary of Labor and the Comptroller General. The report must give the name and address of the violating contractor or subcontractor; the name and address of the contractor or subcontractor which will complete the work; and the contract number, dollar amount, and description of work for the replacement contract.

    (b) *Lease Agreements.* A lease agreement may be terminated and the lessor, general contractor, or subcontractor declared ineligible under 29 CFR 5.6 for violating the Contract Work Hours and Safety Standards Act. However, a lease agreement may not be terminated for failure to pay prevailing wages.

12. *Liquidated Damages.* If the VP, P&M, finds that an assessment of liquidated damages for failure to pay overtime wages is incorrect, or that the failure to pay overtime wages was inadvertent, the VP may adjust the damages or release the contractor, lessor, or subcontractor from liability when the amount of damages is $100 or less. If the amount is over $100, the VP may recommend adjustment or relief to the Secretary of Labor (see 29 CFR 5.8).

## 10.2.5 Walsh-Healey Public Contracts Act

10.2.5.a *General.* The Walsh-Healey Public Contracts Act (41 U.S.C. 35–45) requires that certain contracts for the manufacture or furnishing of supplies must be with manufacturers or regular dealers in the supplies manufactured or used in performing the contract. The Act also establishes requirements pertaining to minimum wages, maximum hours, child labor, convict labor, and safe and sanitary working conditions.

10.2.5.b *Requirement.* All contracts for supplies over $10,000 (except those exempt under paragraph e below) must be with manufacturers or regular dealers, and must incorporate the Walsh-Healey Public Contracts Act requirements by reference. No contracting officer, contractor, or subcontractor may purchase quantities amounting to less than $10,000 to avoid compliance with the Act.

1. If a contract for $10,000 or less is modified to exceed $10,000, the Act applies.
2. If a contract that exceeds $10,000 is modified to $10,000 or less, the work performed after the modification is subject to the Act if both parties agreed to the modification.
3. The Act applies to indefinite delivery contracts and ordering agreements if the aggregate amount of all orders is expected to exceed $10,000 during the year following award. Indefinite delivery contracts and ordering agreements not initially subject to the Act become subject to the Act if orders will exceed $10,000 during any year after the first year. Applicability must therefore be determined annually until the contracts or agreements become subject to the act.

10.2.5.c *Solicitation Provision.* All solicitations that will result in contracts subject to the Act (see paragraph b above) must include Provision 10-2, *Regular Dealer/Manufacturer Representation.*

10.2.5.d *Clause.* All contracts subject to the Act (see paragraph b above) must include Clause 10-8, *Walsh-Healey Public Contracts Act.*

10.2.5.e *Exemptions.* The following purchases are exempt from the Walsh-Healey Public Contracts Act:

1. Noncompetitive purchases justified by unusual or compelling urgency (when delay would seriously harm the Postal Service).
2. Perishables, including dairy, livestock, and nursery products.
3. Purchases of agricultural or farm products processed for first sale by the original producers.

10.2.5.f *Definitions.* The definitions below apply to terms in the Walsh-Healey Public Contracts Act.

1. *Manufacturer.* A person who owns, operates, or maintains a factory or establishment that produces on the premises the type of supplies described in the contract specifications. An offeror qualifies as a manufacturer if it shows before award that it is:
   (a) An established manufacturer of the type of item being purchased; or
   (b) New in the field but has arranged for all the space, equipment, and personnel necessary to perform the contract. If a firm has written, binding commitments for these before award, it may not be barred from award merely because it has not yet done any manufacturing.

2. *Regular dealer.* A person who owns, operates, or maintains a store, warehouse, or other establishment in which supplies such as described by the contract specifications are bought, kept in stock, and sold to the public in the normal course of business. Exceptions are in (b) and (c) below.

   (a) An offeror qualifies as a regular dealer if it shows before award that it meets all of the following requirements:

      (1) It has an establishment or leased or assigned space in which it regularly keeps a stock of supplies in which it claims to be a dealer (if the space is in a public warehouse, it must be maintained on a continuing — not a demand — basis).

      (2) The stock is a true inventory from which sales are made. This requirement is not satisfied by a stock of samples or display items, supplies left over from past orders, stock unrelated to the supplies offered, or stock kept primarily for token compliance with the Act from which few, if any, sales are made.

      (3) The supplies stocked are the same type as those to be supplied under the contract. To be the same type, the items must be either identical or supplies for which dealers in the same line of business would be an obvious source.

      (4) Recurring sales are made regularly from the stock. They cannot be an occasional exception to the usual business operations. The proportion of sales from stock that will satisfy this requirement depends on the nature of the business.

      (5) Sales are made regularly in the usual course of business to the public (not federal, state, or local government agencies). This requirement is not satisfied if the contractor merely seeks to sell to the public but has not yet made sales. If government agencies are the sole purchasers, the offeror does not qualify as a regular dealer. The number and amount of sales that must be made to the public will vary with the amount of total sales and nature of the business.

      (6) The business is an established and going concern. It is insufficient to show that arrangements have been made to set up such a business.

   (b) For certain products (lumber and lumber products, machine tools, hay, grain, feed or straw, raw cotton, green coffee, petroleum, agriculture liming materials, tea, and raw or unmanufactured cotton linters), there are different definitions for "regular dealer." The qualifications are in the regulations of the Secretary of Labor (41 CFR 50-201.101(b)).

   (c) Coal dealers are exempt from the regular dealer requirements if they meet the terms and conditions set by the Secretary of Labor in 41 CFR 50-201.604(a). If these terms and conditions are not met, coal dealers must meet the requirements in subparagraph f.2 above.

10.2.5.g *Agents.* A manufacturer or regular dealer may offer, negotiate, or contract through an agent if the agency is disclosed and the agent acts and contracts in the name of the principal (see 1.9.3).

10.2.5.h *Determining Eligibility of Offerors*

1. The initial responsibility for applying the eligibility requirements rests with the contracting officer. The Department of Labor does not conduct preaward investigations or make final determinations until the contracting officer has determined eligibility or ineligibility.

2. If the contracting officer has determined that an apparently successful offeror is ineligible, the contracting officer must notify the offeror promptly in writing, informing the offeror:

   (a) Of the reason for the determination;

   (b) That to protest, the offeror may submit evidence of eligibility to the contracting officer; and

   (c) That if, after reviewing the evidence submitted by the offeror, the contracting officer has not changed position, the protest, together with all pertinent material, will be forwarded to the Administrator, Wage and Hour Division, Department of Labor, for a final determination.

3. If an offeror's protest is forwarded to the Department of Labor for eligibility review, the contracting officer must comply with i.2(c) through (f) below.

10.2.5.i *Protests*

1. If an apparently successful offeror protests the contracting officer's determination of ineligibility in response to the notification given (see subparagraph h.2 above), and if the contracting officer does not change position after reviewing the evidence submitted by the protester, the contracting officer must forward the protest to the Administrator, Wage and Hour Division, for a final determination.

2. When an offeror challenges the eligibility of the apparently successful offeror before award:

   (a) The contracting officer must notify the protester promptly in writing that:

      (1) The protester may submit evidence concerning the ineligibility to the contracting officer; and

      (2) After reviewing the evidence, the contracting officer will make a decision and, if unfavorable to the protester, forward the protest, along with all pertinent material, to the Administrator, Wage and Hour Division, for a final determination.

   (b) The contracting officer must notify the apparently successful offeror promptly in writing that the offeror's eligibility under the Walsh-Healey Public Contracts Act has been challenged and that:

      (1) The offeror may submit evidence concerning the matter to the contracting officer; and

      (2) After reviewing the evidence, the contracting officer will make a decision and, if unfavorable to the protester, forward the protest, along with all pertinent material, to the Administrator, Wage and Hour Division, for a final determination.

   (c) The contracting officer must notify offerors that might become eligible for award, when an award is to be withheld under (d) below, and ask them to extend their proposal acceptance period if necessary.

   (d) If the contracting officer forwards a case to the Department of Labor for eligibility review, award must be withheld until the contracting officer receives a final determination from the Department of Labor or the contracting officer determines that award must be made because:

      (1) The supplies are urgently required;

      (2) Delivery or performance will be unduly delayed by failure to make the award promptly; or

      (3) A prompt award will be advantageous to the Postal Service.

(e) If the contracting officer decides to proceed with award after forwarding a case to the Department of Labor, the contracting officer must notify the protester and any other concerned parties in writing.

(f) If an award is made under (d) above, the contracting officer must explain in the contract file the need for making an award before receiving the Department of Labor's determination.

3. Protests received after award must be forwarded to the Department of Labor if the contract has not been completed. The contracting officer must notify the protester that this has been done. If the contract has been completed, the protester must be notified that no action will be taken on the protest.

10.2.5.j *Other Responsibilities.* When a contract subject to the Act is awarded, the contracting officer, under the regulations or instructions issued by the Secretary of Labor must:

1. Give the contractor a Department of Labor combination letter and poster (WH Publication 1313) explaining the Walsh-Healey Public Contracts Act; and

2. Report any violation of the representations or stipulations required by the Walsh-Healey Public Contracts Act to the Secretary of Labor through the Inspection Service.

10.2.5.k *Exceptions to Required Stipulations.* The Secretary of Labor may allow exceptions to the requirement that the representations and stipulations of the Act be included in contracts. The contracting officer must submit requests for exceptions to the Administrator, Wage and Hour Division, Department of Labor, through the Manager, Policies, Planning, and Diversity.

## 10.2.6 Fair Labor Standards Act of 1938

10.2.6.a *General.* The Fair Labor Standards Act (29 U.S.C. 201–219) provides for minimum wages and maximum workhours and a Wage and Hour Division in the Department of Labor to interpret and enforce the Act (including investigating and inspecting General contractors). It also prohibits oppressive child labor. The Act applies to all employees (with some exceptions) engaged in interstate or foreign commerce, the production of supplies for such commerce, or any closely related process or occupation essential to such production.

10.2.6.b *Inquiries About the Act.* Contractors or their employees who inquire concerning the applicability or interpretation of the Act must be advised that rulings on it fall under the jurisdiction of the Department of Labor and must be referred to the Regional Administrator, Wage and Hour Division, Department of Labor.

## 10.2.7 Equal Employment Opportunity

10.2.7.a *General*

1. Executive Order (EO) 11246 prohibits any discrimination in employment by government contractors and subcontractors based on race, color, religion, sex, or national origin. The Executive Order sets forth a clause for inclusion in all nonexempt government contracts and subcontracts (Clause 10-9, *Equal Opportunity*).

2. The Secretary of Labor is responsible for issuing regulations implementing EO 11246. These regulations are in 41 CFR 60. The Secretary has

delegated to the Director, Office of Federal Contract Compliance Programs (OFCCP), the authority and responsibility to carry out the program.

3. No contract (or contract modification involving new procurement) may be entered into, and no subcontract approved, with a contractor or subcontractor found ineligible by the Director, OFCCP, for reasons of noncompliance with EO 11246.

4. Contracting officers and contractors may not contract for supplies and services in a way designed to avoid the requirements of EO 11246.

5. Contractor disputes related to compliance with EO 11246 must be handled according to the regulations of the Secretary of Labor (see 41 CFR 60-1.1).

10.2.7.b *Exempt Contracts*

1. *Transactions of $10,000 or Less*

   (a) Contracts and subcontracts of $10,000 or less are exempt from the requirements of EO 11246 and Clause 10-9, *Equal Opportunity*, unless the aggregate amount of all contracts or subcontracts awarded to the contractor or subcontractor in any 12-month period will exceed $10,000. (However, government bills of lading, contracts with depositories of Postal Service funds, and contracts with financial institutions that are issuing and paying agents for U.S. savings bonds and savings notes are not exempt regardless of amount).

   (b) Indefinite delivery contracts and ordering agreements are exempt only when the amount to be ordered in any year under the contract will not exceed $10,000. The contracting officer must determine this at the time of award for the first year, and annually for each succeeding year. Whenever a single order exceeds $10,000, Clause 10-9, *Equal Opportunity*, applies. Once clause 10-9 applies, it continues in effect for the duration of the contract or ordering agreement, regardless of the amounts ordered or expected to be ordered.

2. *Contracts with State or Local Governments.* If a contract is with a state or local government, the agencies, instrumentalities, or subdivision that are not involved in the contract work do not fall under the requirements of EO 11246.

3. *Contracts with Certain Educational Institutions.* It is not a violation of EO 11246 for an educational institution to employ members of a particular religion if the institution is owned, supported, controlled, or managed (in whole or substantial part) by a religious group, or if the curriculum propagates a particular religion.

4. *Work On or Near Indian Reservations.* It is not a violation of EO 11246 for a contractor to announce publicly a preference for employment of American Indians living on or near an Indian reservation. "Near" includes the area within which a person could commute daily. Contractors extending such a preference must not, however, discriminate among Indians on the basis of religion, sex, or tribe. Using such a preference does not exclude a contractor from complying with the Executive Order.

5. *Contracts Exempted by the VP.* The responsible VP may determine that a contract is essential and must be awarded without complying with one or more of the requirements of EO 11246 in the interest of the Postal Service.

6. *Contracts Exempted by the Director, OFCCP.*

   (a) The Director, OFCCP, may exempt the Postal Service from having to include one or more of the requirements of EO 11246 in any contract

when required by special circumstances in the national interest. The Director may also exempt groups or categories of contracts when it is not feasible to act upon each request individually or when group exemptions are more convenient.

(b) The Director, OFCCP, may exempt any facilities of a contractor that are totally separate and distinct from work related to the contract when the exemption will not interfere with the effectiveness of EO 11246.

(c) Contracting officers may request exemptions by submitting a justification to the Director, OFCCP, through the responsible VP.

(d) The Director, OFCCP, may withdraw an exemption for a specific contract or group of contracts. Such withdrawal does not apply to contracts awarded before withdrawal, or to competitive contracts when the withdrawal is made less than ten days before the date set for receipt of proposals.

10.2.7.c *Preaward Compliance Reviews*

1. Before awarding any contract of $1,000,000 or more (excluding construction contracts and contracts exempt under paragraph b above), the contracting officer must request the appropriate OFCCP regional office to conduct a compliance review of the contractor's employment practices, and those of all known first-tier subcontractors with subcontracts of $1,000,000 or more, except when a compliance review has been conducted within 12 months before award). This requirement applies to a modification of an existing contract that increases its value to $1,000,000 or more, a contract modification adding new procurement of $1,000,000 or more, a letter contract, and an indefinite delivery contract or ordering agreement under which orders are expected to aggregate $1,000,000 or more.

2. The contracting officer must include the following information in the preaward request: name and address of prospective contractor or subcontractor; telephone number; anticipated award date; information about previous government contracts or subcontracts held; place of performance; and the estimated dollar amount of the contract or subcontract. Whenever possible, preaward review requests must be submitted at least 30 days before the anticipated award date. Oral requests must be confirmed in writing.

3. If the OFCCP has not made a final preaward determination within 30 days from submission of the request, the contracting officer must withhold award of the contract for an additional 15 days, or until clearance is received, whichever occurs first. If the additional 15 days expire, and the OFCCP has neither found the contractor to be in compliance nor made a final written determination declaring the contractor ineligible for reasons of noncompliance, the award may be made. The contracting officer must notify the OFCCP regional office of the award.

4. These procedures do not apply when the responsible VP finds that the procedures would delay an urgent or critical award or delay an award beyond the time specified for acceptance of a proposal. In such cases, the contracting officer must inform the Director, OFCCP, requesting a postaward review.

10.2.7.d *Affirmative Action Programs*

1. *Nonconstruction.* Except for contracts exempt under paragraph b above, each nonconstruction prime contractor and each subcontractor with 50 or more employees and (a) a contract or subcontract of $50,000 or more or (b)

government bills of lading that in any 12-month period, total, or can reasonably be expected to total, $50,000 or more, is required to develop a written affirmative action program for each of its establishments (see 41 CFR 60-1.40).

2. *Construction*

(a) Except for contracts exempt under paragraph b above, construction contractors are required to meet affirmative action requirements that apply to covered geographical areas or projects, and the applicable requirements of 41 CFR 60-1 and 60-4.

(b) A contracting officer contemplating a construction project over $10,000 within a geographic area not known to be covered by specific affirmative action goals must request the most current information from the OFCCP regional office before issuing the solicitation.

(c) Contracting officers must give written notice to the OFCCP regional office within ten days after award of a contract subject to these requirements.

10.2.7.e *Poster.* The contracting officer must supply appropriate quantities of Poster OFCCP-1420, *Equal Opportunity is the Law,* to contractors subject to EO 11246. The poster is available from the General Services Administration and contains text in both English and Spanish. The stock number is 7690-00-926-8988.

10.2.7.f *Inquiries*

1. Inquiries from contractors regarding status of compliance with EO 11246, or rights to appeal any of the enforcement actions in paragraph h below, must be referred to the OFCCP regional office.

2. Inquiries from labor unions regarding revision of a collective compliance with EO 11246 must be referred to the OFCCP regional office, and the complainant must be notified of the referral in writing. The complainant's name, the nature of the complaint, or the fact that the complaint was received may be disclosed only to the OFCCP.

10.2.7.g *Complaints.* Any complaint received by a contracting officer concerning compliance with EO 11246 must be referred to the OFCCP regional office, and the complainant must be notified of the referral in writing. The complainant's name, the nature of the complaint, or the fact that the complaint was received may be disclosed only to the OFCCP.

10.2.7.h *Enforcement.* At the written direction of the Director, OFCCP, one or more of the following actions, as well as administrative sanctions and penalties, may be exercised against contractors found to be in violation of EO 11246, the regulations of the Secretary of Labor, or the applicable contract clauses:

1. Publication of the names of the contractors or their unions.

2. Cancellation, termination, or suspension of the contractor's contracts or portion thereof.

3. Debarment from future contracts, or extensions or modifications of existing contracts, until the contractor has established and carried out personnel and employment policies in compliance with EO 11246 and the regulations of the Secretary of Labor.

4. Referral by the Director, OFCCP, of any matter arising under EO 11246 to the Department of Justice or to the Equal Employment Opportunity Commission (EEOC) for the institution of appropriate civil or criminal proceedings.

10.2.7.i *Solicitation Provisions.* Except when contracts will be exempt from EO 11246 under paragraph b above, solicitations must include the following provisions:

1. *Other Than Construction*

   (a) Provision 10-3, *Certification of Nonsegregated Facilities.*

   (b) Provision 10-4, *Equal Opportunity Affirmative Action Program*, when proposals of $50,000 or more are anticipated from offerors having 50 or more employees.

   (c) Provision 10-5, *Preaward Equal Opportunity Compliance Review*, when the amount of the contract is expected to be $1,000,000 or more.

2. *Construction*

   (a) Provision 10-3, *Certification of Nonsegregated Facilities.*

   (b) Provision 10-6, *Notice of Requirement for Equal Opportunity Affirmative Action.*

10.2.7.j *Clauses.* Contracts not exempt from EO 11246 under paragraph b above must include the following clauses:

1. Clause 10-9, *Equal Opportunity.*
2. Clause 10-10, *Affirmative Action Compliance Requirements for Construction*, in contracts for construction.
3. Clause 10-11, *Equal Opportunity Preaward Clearance of Subcontracts*, in contracts over $1,000,000.

## 10.2.8 Workshops for People who are Blind or Severely Disabled

See section 3.1.3.

## 10.2.9 Blind Persons' Priority for Food Vending Services

People who are blind and licensed under the provisions of the Randolph-Sheppard Act (20 U.S.C. 107 et seq.) or by a state agency must be given priority for the operation of food vending services in Postal Service buildings. See 32 CFR 601 and the relevant handbook.

## 10.2.10 Service Contract Act

10.2.10.a *General.* The Service Contract Act of 1965 (Public Law 89-286, 41 U.S.C. 351 et seq.) applies to any contract whose principal purpose is to provide services to be performed by service employees.

1. Employees working under a service contract must be paid no less than the minimum wage specified by the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201 et seq.).
2. Service contracts over $2,500 must contain the clauses required by paragraph e below concerning minimum wages, including fringe benefits; safe and sanitary working conditions; and employee notification of the compensation required under the Act.
3. Many types of services are covered by the Act, which attempts to cover contract workers who do not fall under the Davis-Bacon Act for construction

and the Walsh-Healey Public Contracts Act for supplies. 29 CFR 4, Subpart C, and CFR 4.101 provide examples of coverage. The Act does not cover executive, administrative, or professional personnel. If services are only incidental to the performance of a contract, the Act does not apply.

4. The Act also applies to subcontracts under covered contracts, and prime contractors must include the Service Contract Act provisions in subcontracts for services. Except where indicated, the terms "contract" and "contractor" include "subcontracts" and "subcontractors" in this part 10.2.10.

5. The Secretary of Labor administers and enforces the Service Contract Act.

10.2.10.b *Exemptions*

1. The following contracts are exempt from the Service Contract Act, subject to subparagraph b.2 below:

(a) Any contract for construction, alteration, or repair, including painting and decorating.

(b) Any work covered by the Walsh-Healey Public Contracts Act (see 10.2.5).

(c) Any contract for transporting freight or personnel by ship, plane, bus, truck, express, railway line, or oil or gas pipeline when published tariff rates are in effect or rates are covered by section 10721 of the Interstate Commerce Act.

(d) Any service contract with a radio, telephone, telegraph, or cable company subject to the Communications Act of 1934.

(e) Any contract for public utility services, including electric light and power, water, steam, and gas.

(f) Any employment contract with individuals for direct services.

(g) Any contract that is principally for contract postal units.

(h) Contracts with common carriers for mail transportation by rail, air (except air-taxi routes), bus, or ocean vessel on regularly scheduled runs over established routes, when mail accounts for a small portion of the revenue.

(i) Contracts for mail service with an individual owner/operator, when it is not believed that the contractor will hire service employees under the contract except for short vacations or unexpected contingencies or emergencies.

(j) Contracts principally for the maintenance, calibration, or repair of:

(1) Automated data processing equipment (including office information and word processing equipment);

(2) Scientific and medical equipment involving sophisticated technology; or

(3) Office or business machines not included under (1) above, when the services are performed by the manufacturer or supplier.

2. The exemptions in subparagraph b.1 above apply only when the contractor certifies that:

(a) The equipment is commercially available, used regularly outside the government, and normally sold or traded by the contractor to the public in substantial quantities;

(b) Prices are established catalog or market prices; and

(c) Wages and fringe benefits paid under the contract are the same as the contractor pays employees servicing the same equipment for commercial customers.

10.2.10.c *Clauses*

1. *Contracts Over $2,500.* Clause 10-12, *Service Contract Act*, must be included in every contract for services covered by the Act that is over $2,500 or is modified to exceed $2,500. This includes indefinite-delivery contracts and ordering agreements when orders are expected to aggregate more than $2,500.

2. *Contracts of $2,500 or Less.* Every contract of $2,500 or less for services covered by the Act must include Clause 10-13, *Service Contract Act — Short Form.*

3. *Multiyear Service Contracts and Service Contracts with Renewal Options.* Except for mail transportation contracts, multiyear service contracts and service contracts with options to renew that include clause 10-12 or clause 10-13 must also include Clause 10-14, *Fair Labor Standards Act and Service Contract Act — Price Adjustment.*

10.2.10.d *Notice of Intent to Make a Service Contract*

1. The contracting officer must file a notice of intent to make a service contract with the Wage and Hour Division, Employment Standards Administration, Department of Labor, for any contract over $2,500 covered by the Act. Standard Form 98, *Notice of Intention to Make a Service Contract*, must be used. The notice must be accompanied by Standard Form 98a or a statement indicating the numbers and classes of service employees expected to perform the contract, or a statement that the number will not exceed five.

2. Whenever possible, notice of intent must be filed at least 60 days (30 days for unanticipated requirements) before a competitive solicitation is issued, noncompetitive negotiations begin, an option is exercised, a contract is extended, or the anniversary date of a multiyear contract. If it is not possible to file a notice before the 30-day limit, it must be filed as soon as possible, with an explanation of why it was not filed on time.

3. If the contract will be for substantially the same services as are being furnished at the same location by an incumbent contractor whose contract the proposed contract will succeed, and the wages and fringe benefits of the service employees are determined by a collective bargaining agreement, the agreement must be filed with the Standard Form 98, along with any related documents specifying wages and fringe benefits that will apply to the contract. If the contracting officer believes that the collective bargaining agreement was not the result of "arm's-length" negotiations, a statement of the facts leading the contracting officer to that conclusion must accompany the agreement and the Office of Special Wage Standards must be advised if the wages and fringe benefits vary substantially from those for similar services.

10.2.10.e *Minimum Wage Determinations*

1. If more than five service employees will be involved in performing work covered by the Service Contract Act, the contract may not be awarded without a Department of Labor determination of applicable minimum wages and fringe benefits, unless the determination will be incorporated in the contract after award.

2. The required determination will normally be issued by the Wage and Hour Division, Employment Standards Administration, in response to the notice of intent filed under paragraph d above, in sufficient time to be included as an attachment to the solicitation.

3. If the place of performance is unknown when the solicitation is issued, a wage determination need not be included in the original solicitation. Instead, when proposals are received, a notice of intent must be filed in accordance with paragraph d above showing each location where the contract might be performed, so that a wage determination may be made for each. The wage determination that applies to the successful offeror must be included in the contract. If the Department of Labor finds this impracticable, the Department may issue a composite wage determination.

4. The contracting officer must contact the Wage and Hour Division to find out whether a wage determination is still current when a solicitation or negotiation has been delayed for more than 60 days from the anticipated date of award stated on the Standard Form 98 submitted. Any wage determination received in response must replace the earlier wage determination.

5. When a notice of intent has been filed but the wage determination has not been received in time for attachment to the solicitation, the solicitation must state that the wage determination will be issued as an amendment to the solicitation or incorporated into the contract at the time of award.

6. Any revision of a wage determination received less than ten days before proposals are due is not effective unless there is enough time to notify offerors. If the contract action involves noncompetitive procedures, exercise of an option or extension of a contract, any revision of a wage determination received after award is not effective if performance begins within 30 days after award; otherwise, any revision received at least ten days before performance begins is effective.

7. If circumstances require that a contract be awarded before a wage determination is obtained, the contract must include Clause 10-12, *Service Contract Act*, and provide for equitable adjustment of the contract terms when the wage determination is incorporated, effective from the date of issuance unless another effective date is specified in the determination. The notice of intent, if not already filed, must be filed promptly and explain the need for immediate award.

8. The Wage and Hour Division may require that a wage determination be applied to a contract retroactively, if the contract is subject to the Service Contract Act and more than five service employees are involved in performing the work. If the contracting officer questions the applicability of the Act to the contract, the contracting officer must forward the matter for resolution to assigned counsel. If it is determined that the Service Contract Act is not applicable to the contract, the contracting officer must advise the Department of Labor of the basis for this determination. No further action is needed unless the Secretary of Labor determines that the contract is subject to the Act.

9. If a wage determination does not contain all the classifications and rates requested in the notice of intent, those classifications for which no determinations were received must be deleted from the attachment incorporating the wage determination. When omitted classifications or classifications not previously contemplated are found necessary after award,

they must be incorporated following the procedures in Clause 10-12, *Service Contract Act*.

10.2.10.f *Notice of Award.* Upon the award of the contract of $10,000 or more that includes Clause 10-12, *Service Contract Act* (or upon issuing the first order under an indefinite delivery contract or ordering agreement containing that clause), the contracting officer must send an original and one copy of Standard Form 99, *Notice of Award of Contract*, to:

ATTENTION OFFICE OF SPECIAL WAGE STANDARDS
DEPARTMENT OF LABOR
WASHINGTON DC 20210-0001

10.2.10.g *Department of Labor Poster.* At the time of award, the contracting officer must supply the contractor with WH Publication 1313, a Department of Labor combination letter and poster explaining the Service Contract Act.

10.2.10.h *Inquiries Concerning the Act.* Contractors or their employees with questions about the applicability of the Service Contract Act must be referred to:

DEPUTY ASSISTANT SECRETARY
EMPLOYMENT STANDARDS ADMINISTRATION
DEPARTMENT OF LABOR
WASHINGTON DC 20210-0001

Questions concerning safety or health must be referred to:

DIRECTOR
BUREAU OF LABOR STANDARDS
EMPLOYMENT STANDARDS ADMINISTRATION
DEPARTMENT OF LABOR
WASHINGTON DC 20210-0001

Questions may also be directed to any regional office of the Employment Standards Administration.

10.2.10.i *Withholding Contract Payments and Contract Termination*

1. *Withholding*

   (a) A violation of the stipulations of Clause 10-12, *Service Contract Act*, or Clause 10-13, *Service Contract Act — Short Form*, makes the responsible party liable for the sum of any deductions, rebates, refunds, or underpayments due employees. At the written request of a District Director (or above) of the Department of Labor, as much of the accrued payment due on the contract (or any other contract between the contractor and the Postal Service that has not been assigned) must be withheld as is necessary to pay the employees. Withheld sums must be kept in an escrow fund. Any compensation that the Postal Service or the Wage and Hour Division has found to be due must be paid directly from the withheld payments.

   (b) If the withheld payments are insufficient to reimburse the underpaid employees, this fact must be reported to the General Accounting Office (for possible setoff), the Wage and Hour Division of the Department of Labor, and the Department of Justice. The United States may bring an action to recover the remaining amount. Any sums recovered must be held in the escrow fund and paid, on order of the Secretary of Labor, directly to the underpaid employees.

2. *Termination.* Any violation of Clause 10-12, *Service Contract Act*, or Clause 10-13, *Service Contract Act — Short Form*, may be cause to terminate the contractor's right to continue the work. If the contract is terminated, the Postal Service may enter into other contracts or arrangements to complete the work, charging any additional costs to the contractor.

10.2.10.j *List of Violators.* The Comptroller General sends a list of the names of people or firms in violation of the Service Contract Act to all government agencies. Unless the Secretary of Labor recommends otherwise, Postal Service contracts may not be awarded to any violator on the list (or to any firm, corporation, partnership, or association in which such violator has a substantial interest) for three years from the date the list was published.

## 10.2.11 Employment of the Handicapped

10.2.11.a *Policy.* It is Postal Service policy to comply with the Rehabilitation Act of 1973 (29 U.S.C. 702 et seq.), Executive Order 11758 of January 15, 1974, and the implementing regulations of the Secretary of Labor (41 CFR 60-741). The Act requires contractors to take affirmative action to employ and advance qualified individuals without discrimination as to their physical or mental handicaps.

10.2.11.b *Applicability*

1. *General.* With the exceptions below, every contract for supplies or services (including construction and transportation services) over $2,500 must include Clause 10-15, *Affirmative Action for Handicapped Workers.*

   (a) *Contracts with State and Local Government.* The requirements of Clause 10-15 do not apply to any agency, instrumentality, or subdivision of the state or local government that does not participate in work under the contract.

   (b) *Exemption.* The VP, Purchasing and Materials, may exempt any contractor or subcontractor (or any group or category of contractor or subcontractor) from any provisions of Clause 10-15 in the Postal Service's interest.

   (c) *Request for Exemption.* The contracting officer must submit a justification for any proposed exemption to the VP, Purchasing and Materials.

10.2.11.c *Department of Labor Notices.* Under Clause 10-15, the contracting officer must supply the contractor with Department of Labor notices that state the contractor's obligations and handicapped individuals' rights under the Employment of the Handicapped program. These notices may be obtained from:

OFFICE OF INFORMATION
EMPLOYMENT STANDARDS ADMINISTRATION
DEPARTMENT OF LABOR
WASHINGTON DC 20210-0001

10.2.11.d *Collective Bargaining Agreements.* When performance under Clause 10-15 requires revision of a collective bargaining agreement, the unions that are parties to such agreements must be advised that the Department of Labor will give them appropriate opportunity to express their views. Neither the contracting officer nor any representative of the contracting officer may discuss with representatives of the contractor or of labor any aspects of the collective bargaining agreements.

10.2.11.e *Complaints.* The contracting officer must forward any complaint concerning the Act through channels to the VP, Purchasing and Materials. No investigation or attempt to resolve the complaint may be made without specific instructions from the VP, Purchasing and Materials.

10.2.11.f *Department of Labor Sanctions.* When Policies, Planning, and Diversity is notified that the Department of Labor has imposed sanctions on a contractor (such as withholding progress payments, terminating or suspending the contract, or

debarring the contractor) for violation of Clause 10-15, the contracting officer must put the sanctions into effect as soon as possible.

## 10.2.12 Veterans

10.2.12.a *Requirement.* The Vietnam Era Veterans Readjustment Assistance Act of 1972 (38 U.S.C. 2012), Executive Order 11701 of January 23, 1973, and the implementing regulations of the Secretary of Labor (41 CFR 60-250) require contractors to take affirmative action to employ veterans of the Vietnam era without discrimination based on their disability, and to list all employment openings with appropriate local employment services.

10.2.12.b *Applicability*

1. *General.* Except as provided in subparagraph b.2 below, every contract for supplies or services (including utility, construction, and transportation services) or for the use of real or personal property (including lease arrangements) in the amount of $10,000 or more must include Clause 10-16, *Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era.* No contracting officer, contractor, or subcontractor may purchase quantities of supplies or services in less-than-normal quantities to avoid application of Clause 10-16.
2. *Exceptions*
   - (a) *Contracts with State and Local Governments.* Clause 10-16 does not apply to any agency, instrumentality, or subdivision of a state or local Government that does not participate in work under the contract.
   - (b) *Exemption.* The Postmaster General (with the concurrence of the Director, Office of Federal Contract Compliance Program (OFCCP), Department of Labor) may exempt any contract or category of contracts from any part of Clause 10-16 in the national interest.
3. *Request for Exemption.* The contracting officer must submit a detailed justification for any proposed exemption to the VP, Purchasing and Materials, for submission through channels to the Postmaster General and the Director, OFCCP.

10.2.12.c *Department of Labor Notices.* The contracting officer must furnish the contractor appropriate notices for posting when such notices are prescribed by the Director, OFCCP.

10.2.12.d *Complaints.* The contracting officer must forward any complaint concerning the Act through channels to the VP, Purchasing and Materials. No investigation or attempt to resolve the complaint may be made without specific instructions from the VP, Purchasing and Materials.

10.2.12.e *Department of Labor Sanctions.* When Policies, Planning, and Diversity is notified that the Department of Labor has imposed sanctions on a contractor (such as withholding progress payments, terminating or suspending the contract, or debarring the contractor) for violation of Clause 10-16, the contracting officer must put the sanctions into effect as soon as possible.

# SECTION 3 BUY AMERICAN POLICY

## 10.3.1 Policy

Postal Service policy is to give preference to domestic-source products and materials in purchasing supplies and services, in accordance with the provisions of this manual, which are based on the Buy American Act (41 U.S.C. 10a-d). With respect to individual procurements or procurement categories, the Postmaster General may adopt more stringent standards for domestic manufacture when required in the interest of the Postal Service.

## 10.3.2 Supplies

10.3.2.a *Applicability.* The procedures in this part apply to all purchase of supplies, or services that involve the furnishing of supplies. Deviations may be authorized by the VP, Purchasing and Materials.

10.3.2.b *Definitions*

1. *End products.* Articles, materials, and supplies to be purchased for Postal Service use.
2. *Components.* Articles, materials, and supplies directly incorporated in end products.
3. *Domestic-source end product.* An unmanufactured end product mined or produced in the United States or an end product manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. The cost of components includes transportation costs to the place of incorporation into the end product and, in the case of components of foreign origin, duty (whether or not a duty-free entry certificate is issued). For procurements in excess of $25,000, components of Canadian origin are treated as domestic. The articles and materials listed in 10.3.4 are considered to have been mined, produced, or manufactured in the United States, regardless of their source in fact.
4. *Foreign end product.* An end product other than a domestic-source end product.
5. *Domestic proposal.* A proposed price for a domestic-source end product, including transportation to destination.
6. *Foreign proposal.* A proposed price for a foreign end product, including transportation to destination and duty (whether or not a duty-free entry certificate is issued).

10.3.2.c *Requirement.* Only domestic-source end products may be purchased, except when the VP, Purchasing and Materials, determines that:

1. The articles, materials, or supplies are of a class or kind not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of satisfactory quality (see 10.3.4); or
2. Purchase of domestic-source end product would be inconsistent with the interest of the Postal Service, or that its cost would be unreasonable, as when the price comparison procedures described in paragraph e below result in the purchase of a foreign end product.

10.3.2.d *Proposal Evaluation*

1. If award is to be based solely on price and price-related factor, the procedures of paragraph e below are used for price comparison.

2. If factors other than price will have a significant weight in proposal evaluation, domestic-source end products should receive a preference in the case of closely ranked proposals, unless there are more important discriminators, but no price differential should be applied.

10.3.2.e *Price Comparison.* Each foreign price proposal must be adjusted for purposes of evaluation by adding to the foreign proposal (inclusive of duty) a factor of six percent of that proposal. If a tie results between a foreign proposal and a domestic proposal, the domestic proposal must be selected for award. When more than one line item is involved, the six percent evaluation factor is applied on an item-by-item basis, except that the factor may be applied to any group of items that the solicitation specifies will be awarded as a group.

10.3.2.f *Solicitation Provision.* Solicitations must include Provision 10-7, *Buy American Certificate — Supplies.*

10.3.2.g *Clause.* Contracts must include Clause 10-17, *Preference for Domestic Supplies.*

## 10.3.3 Construction Materials

10.3.3.a *Applicability.* The procedures in this part apply to all construction contracts. Deviations may be authorized by the VP, P&M.

10.3.3.b *Definitions*

1. *Components.* Articles, materials, and supplies incorporated directly into construction materials.

2. *Construction materials.* Articles, materials, and supplies brought to the construction site for incorporation into the building or work.

3. *Domestic construction material.* This means (a) an unmanufactured construction material mined or produced in the United States, or (b) a construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. The cost of each component includes transportation costs to the place of incorporation into the construction material and any applicable duty (whether or not a duty-free entry certificate is issued). Components of foreign origin of the same class or kind as those listed in 10.3.4 are treated as domestic.

4. *Foreign construction material.* A construction material other than a domestic construction material.

10.3.3.c *Requirement.* Only domestic construction materials may be used in construction, except:

1. When the contracting officer determines that use of a particular domestic construction material would be impracticable, or that its cost would be unreasonable, under guidelines established by the VP, P&M, in the relevant handbook; or

2. When the VP, P&M, determines that a construction material is not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of satisfactory quality (see 10.3.4).

10.3.3.d *Solicitation Provision.* Solicitations must include Provision 10-8, *Buy American Certificate — Construction Materials.*

10.3.3.e *Clause.* Contracts must include Clause 10-18, *Preference for Domestic Construction Materials.*

## 10.3.4 List of Excepted Articles and Materials

The VP, Purchasing and Materials, has determined that the articles and materials listed below are not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of satisfactory quality, or that it would be inconsistent with the interest of the Postal Service to apply the Buy American policy to these articles and materials. When incorporated into end products or construction materials manufactured in the United States, these items may be regarded as components of domestic origin for the purpose of determining the origin of the manufactured end products or construction materials:

Acetylene, black

Asbestos, amosite

Books/pamphlets;/newspapers/magazines/periodicals: printed briefs and films not printed in the United States and for which domestic editions are not available

Cadmium, ores and flue dust

Calcium cyanamide

Chrome ore or chromite

Cobalt, in cathodes, rondelles, or other primary forms

Cork, wood or bark and waste

Cover glass, microscope slide

Diamonds, industrial, stones

Emetine, bulk

Ergot, crude

Fibers of the following types: agave, coir, jute, and palmyra

Graphite, natural

Hand sewing needles

Hyoscine, bulk

Leather, sheepskin, hair type

Mica

Nickel, primary, in ingots, pigs, shot, cathodes, or similar form; nickel oxide and nickel salts

Nitroguanidine (also known as picrite)

Petroleum, crude oil, finished products, and unfinished oils (see petroleum definitions in paragraph a–c below)

Platinum and platinum group metals refined, as sponge, powder, ingots, or cast bars

Pyrethrum flowers

Quartz crystals

Quebracho

Radium salts

Rosettes

Rubber, crude and latex

Rutile

Wire glass

Woods of the following species: angelique, balsa, ekki, greenheart, lignum vitae, mahogany, and teak

10.3.4.a *Crude oil.* Crude petroleum as produced at the wellhead and liquids (under atmospheric conditions) recovered from mixtures of hydrocarbons that existed in a vaporous phase in a reservoir and are not natural gas products.

10.3.4.b *Finished products.* Any one or more of the following petroleum oils, or a mixture or combination of them to be used without further processing except blending by mechanical means:

1. Liquefied gases – hydrocarbon gases recovered from natural gas or produced from petroleum refining and kept under pressure to maintain a liquid state at ambient temperatures.
2. Gasoline – a refined petroleum distillate that, by its composition, is suitable for use as a carburetant in internal combustion engines.
3. Jet fuel – a refined petroleum distillate used to fuel jet propulsion engines.
4. Naphtha – a refined petroleum distillate falling within a distillation range overlapping the higher gasolines and lower kerosenes.
5. Fuel oil – a liquid or liquefiable petroleum product burned for lighting or for the generation of heat or power and derived directly or indirectly from crude oil, such as kerosene, range oil, distillate fuel oils, gas oil, diesel fuel, topped crude oil, and residues.
6. Lubricating oil – a refined petroleum distillate or specially treated petroleum residue used to lessen friction between surfaces.
7. Residual fuel oil – a topped crude oil or viscous residuum that, as obtained in refining or after blending with other fuel oil, meets or is the equivalent of Military Specifications Mil-F-859.
8. Asphalt – a solid or semisolid cementitious material that gradually liquefies when heated, in which the predominating constituents are bitumens, and that is obtained in refining crude oil.
9. Natural gas products – liquids (under atmospheric conditions), including natural gasoline, that are recovered by a process of absorption, adsorption, compression, refrigeration, cycling, or a combination of such processes, from mixtures of hydrocarbons that existed in a vaporous phase in a reservoir and that, when recovered and without processing in a refinery, otherwise fall within any of the definitions of products contained in b.2 through b.5 above.

10.3.4.c *Unfinished oils.* One or more of the petroleum oils listed in paragraph b above, or a mixture or combination of such oils, to be further processed other than by blending by mechanical means.

# Section 4 Clean Air Act and Clean Water Act

## 10.4.1 General

The Clean Air Act (42 U.S.C. 7401 et seq.) and the Clean Water Act (33 U.S.C. 1251 et seq.) prohibit any federal agency from contracting with a party

that will use a facility that does not meet the standards of those statutes and their implementing regulations. Executive Order 11738, September 10, 1973, makes these statutes applicable to the Postal Service.

### 10.4.2 Requirements

10.4.2.a The Environmental Protection Agency (EPA) maintains a list of violating facilities. Contractors submitting proposal for contracts expected to exceed $100,000 must certify that the facilities to be used are not on the EPA List of Violating Facilities.

10.4.2.b Provision 10-9, *Clean Air and Water Certification*, must be included in solicitations for contracts expected to exceed $100,000. Contracts over $100,000 must contain Clause 10-19, *Clean Air and Water.*

## SECTION 5 DRUG-FREE WORKPLACE

### 10.5.1 General

10.5.1.a *Policy.* The Postal Service voluntarily adopts the intent and purpose of the Drug-Free Workplace Act of 1988 (Public Law 100–690). Postal Service contracts must require contractors to take affirmative steps to maintain drug-free workplaces. Contractors' failure to do so may result in the imposition of appropriate sanctions.

10.5.1.b *Definitions*

1. *Controlled substance.* Those substances identified in schedules I through V, section 202 of the Controlled Substances Act (21 U.S.C. 812), and as further defined in 21 CFR sections 1308.11 through 1308.15.
2. *Conviction.* A finding of guilt (including a finding based on a plea of guilty or a plea of *nolo contendere*) by any judicial body charged with the responsibility to determine violations of criminal drug statutes.
3. *Criminal drug statute.* A federal or nonfederal criminal statute involving drug abuse.
4. *Drug abuse.* The unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.
5. *Employee.* Any person directly engaged in the performance of work under a Postal Service contract.
6. *Individual.* A contractor with no employees other than himself or herself.
7. *Workplace.* Any site where work is being done in connection with a Postal Service contract.

### 10.5.2 Applicability

The Postal Service's drug-free workplace requirements apply to all Postal Service contracts with individuals without regard to dollar amount, and to all other Postal Service contracts over $50,000.

at register with us at http://www.purchasing.gov/sadi.

475 L'Enfant Plaza SW
Washington DC 20260-6200

# EXHIBIT "B"

EXHIBIT "B"

Mack

RENAULT

13302 Pennsylvania Avenue
Hagerstown, Md. 21742

DATE: DEC, 1 , 1998

Pages: 1

TO: KELLEY

PHONE:

FAX:

FROM: Greg Shank
Mack Trucks

PHONE:
FAX:

Subject: Cleanable Full Flow Oil Filters

Pure Power vs Glacier

USPS Field Test

Kelley,

This is summary of Data discussed with Mack & USPS in November. Clearly the Data confirms the Pure Power Filters were much more efficient in removing the 10 micron and smaller particles, which cause engine wear.

Best Regards,

Greg Shank

# Cleanable Oil Filter Field Test
## USPS

Particle Count



# EXHIBIT "C"

EXHIBIT "C"

Pure Power! Lubricants

Pure Power! Incorporated

#1

January 26, 1999

Dear Mr. A. Keith Strange
Vice President, Purchasing and Materials
U.S. POSTAL SERVICE
475 l'Enfant Plaza, Suite #4021
Washington, DC 20260-6200

Dear Mr. Strange:

Early in 1996 Pure Power! Incorporated (a woman owned small business) entered into a long-term field test program with the U.S. Postal Service. This program was to determine the overall benefits between Pure Power! Lifetime (Reusable/Stainless Steel) Oil Filter and the "Spinner" filter product manufactured by Glacier.

The test was to determine how well each filter would clean the engine oil by extracting particles, which cause damage to the engine; unnecessary repair costs, down time, increased emissions and hazardous waste disposal problems.

The U.S. Postal Service and Mack Trucks conducted the program as a joint effort, with Mack Trucks being responsible for adaptation [illegible] the candidate vehicles after the motor oil had passed through the test oil filters. The motor oil samples were sent to a lab by the U.S. Postal Service and were analyzed for particle size and quantity of trapped particles. After more than two years of testing we received a copy of a summary report from Mack Trucks. This report verified that Pure Power! Lifetime Oil Filters were 60% more efficient at removing harmful particles than the Glacier/Spinner filter. Mack Trucks stated that Pure Power! Lifetime Oil Filters were being recommended for use on all new U.S. Postal Service trucks being purchased from Mack Trucks.

During the two-year test program the Glacier Company repeatedly asked to be allowed to "check" the test vehicles which were utilizing the Glacier/Spinner product. Although they, as well as Pure Power! Incorporated, were made aware at the start that absolutely no involvement by the candidate filter companies would be permitted. After receiving the test results from Mack the USPS held numerous meetings with Mack and had numerous meetings and conversations with the Glacier Company representatives in an attempt to find a way to skirt the recommendation of Mack Trucks. This contract was then awarded for a completely reworked and untested Spinner filter configuration manufactured by Federal-Mogul who recently purchased the Glacier Company.

It is now apparent that a contract has been consummated with Federal-Mogul to purchase the unproven new design of Spinner filters without any contact whatsoever with our company even though tests conducted by Mack Trucks and USPS <u>proved our product to be more effective and of considerably less cost</u>.

We are hereby expecting immediate action on this matter from either you or any of the offices listed below which we are also notifying.

Sincerely,

Fran Cyrus

Ms. Fran Cyrus
President
PURE POWER! INCORPORATED

Enc: 3

e-mail: bclinton@whitehouse.gov
vice.president@whitehouse.gov
senator@feinstein.senate.gov
senator@boxer.senate.gov
corcorane@washpost.com

Fax: Gov. Gray Davis
U.S. Rep. Dana Rohrabacher
L.A. Times
O.C. Register
CBS 60 minutes

Express Mail: All

#1

PURE POWER!® Incorporated
15751 Chemical Lane
Huntington Beach, CA 92649-1508

**Competition Proven Technology**

*Pure Power!*® Lubricants

*Pure Power!*® Lifetime Filter Systems

CONFIDENTIALITY NOTICE

The documents accompanying this FACSIMILE transmission may contain confidential information, which is legally privileged. The information is intended only for the use of the individual or entity named below. If you are not the intended recipient, you are hereby notified that any disclosure, copying distribution or use of any of the information contained in this transmission is strictly PROHIBITED. If you have received this transmission in error, please immediately notify us by telephone and mail the original transmission to us.

## Facsimile Cover Sheet®

**Date:** January 27, 1999

**To:** Keith Strange, V.P., Purchasing & Materials
**Company:** U.S. Postal Service
**Phone:** (202) 268-2000
**Fax:** (202) 268-2755

**From:** Fran Cyrus
**Company:** Pure Power!® Incorporated
**Phone:** (714) 894-2994
**Fax:** (714) 894-6344
**Order Desk:** 1-800-750-0827
**Pages including this cover page:** 5

# EXHIBIT "D"

EXHIBIT "D"

ENGINEERING
DELIVERY & CUSTOMER SER… ES EQUIPMENT

UNITED STATES
POSTAL SERVICE

April 29, 1999

Ms. Fran Cyrus
PurePower ! Inc.
15751 Chemical Lane
Huntington Beach, CA 92649

Dear Ms. Cyrus:

Thank you for writing to Mr. William J. Dowling, Vice President of Engineering, concerning the application of your PurePower oil filter for the USPS Mack Trucks.

In the most recent buy of Mack Trucks, Mack provided the USPS with two options for filters that met their vehicle specifications. The options were PurePower 22-micron and the Spinner 25-micron filters. The Spinner 25-micron filter is an upgrade from Spinner 60-micron filter that was used in the test at the Houston, TX Vehicle Maintenance Facility.

The USPS selected the Spinner 25-micron filter based on the information presented by Mack. The information indicated the Spinner and Pure Power filters were virtually equal in price and performance. Also, the filtering system for the Spinner 25-micron is backward compatible with the Spinner 60-micron filters installed on our earlier buy of Mack Trucks.

If you have any further questions, please call me at (703) 280-7050 or Han Dinh at (703) 280-7138.

Sincerely,

James W. Buie
Manager

cc: William J. Dowling, Vice President, Engineering
A. Keith Strange, Vice President, Purchasing and Materials
David F. Page, Manager, Operation Equipment Purchasing

8403 LEE HIGHWAY
MERRIFIELD, VA 22082-8101
703-280-7050
FAX: (703) 280-8402

# EXHIBIT "E"

EXHIBIT "E"

P. 12/17

rec'd 6-28-99

UNITED STATES POSTAL SERVICE

June 23, 1999

Ms. Fran Cyrus
President
Pure Powerl Incorporated
15751 Chemical Lane
Huntington Beach, CA 92649-1508

Dear Ms. Cyrus:

This is in response to your May 11 letter addressed to Postmaster General and C.E.O. William J. Henderson. Your letter clearly states your belief that Pure Power has been wronged in not having been selected by Mack Trucks as a supplier of oil filters for tractors delivered to the Postal Service under a recent contract. Further, your letter asserts that postal employees inappropriately influenced Mack Trucks into selecting the Spinner filter and perhaps violated postal policies and ethical standards.

As was explained in previous letters, our positive experience with the Spinner filters on prior tractor purchases fully supports our decision to specify them as "brand name or equal." The allegations you have made against postal employees are very serious. However, there is no evidence before us that postal employees have violated any postal policies or ethical standards. In the event you want to pursue these allegations, you should contact the Chief Postal Inspector, Kenneth J. Hunter at (202) 268-4267 or the Inspector General, Karla W. Corcoran at (703) 248-2300 and inform them of the specific information you have.

We are satisfied that neither the Postal Service nor any of its employees have contributed to the problems alleged by Pure Power, and consider this matter closed.

Sincerely,

A. Keith Strange
Vice President
Purchasing and Materials

William J. Dowling
Vice President
Engineering

475 L'Enfant Plaza SW
Washington DC 20260